[No. 2729.]

### JOHN LUTTRELL *v*. THE STATE.

1. PRACTICE—JURY LAW.—Section 22 of the jury law of 1876 was repealed by its omission from the Revised Statutes, and hence it was not error, in completing a panel, to receive jurors summoned in the court room.
2. SAME—EVIDENCE—EXCEPTIONS.—The defense in a trial for theft asked a witness: "Did the defendant state to you and in your presence, on the morning and just before he sent you for said sheep, that it was not his, and not to bring it over?" *Held*, that the question as propounded was leading, and for that reason was properly excluded; and further, that the bill of exceptions saved to its exclusion is insufficient, inasmuch as it does not state the objection interposed by the State.
3. SAME.—A bill of exceptions to the exclusion of evidence should set out the evidence expected to be elicited, in order to enable this court to judge of its admissibility.
4. THEFT—FACT CASE.—See evidence held sufficient to sustain a conviction for theft of sheep.

APPEAL from the County Court of Jack.  Tried below before the Hon. T. M. Jones, County Judge.

The appellant was charged by information with the theft of two sheep, of the value of six dollars, the property of A. J. Hughes.  Upon his trial he was convicted, and as punishment a fine of five dollars and confinement in the county jail for five minutes were assessed against him.

A. J. Hughes, the first witness for the State, testified that he had a sheep which he left in the "post" late in the fall or winter of 1882.  He left the sheep in the care of another party. The report was brought to the witness, about the fourteenth day of February, 1883, that the sheep had been taken out.  He found his sheep in the defendant's yard, when he went to look for it.  Witness gave no one his consent to the taking of the sheep.

Cross-examined, the witness said that he lost a sheep during the fall of 1882.  It got into the "post" in October.  Witness told Mr. Garrison that he would pay his, Garrison's, little boy a dollar to take care of the lamb.  Garrison told witness that defendant or some one else had taken the animal.  Witness went to the defendant's place immediately.  Defendant called to the

witness before the latter got to where he was working about his house, and told him that there was a sheep in his yard; for witness to look at it and see if he, witness, owned it; that he, defendant had sent over to the "post" and got it. Witness replied that it was no use for him to go and look at it, as he knew that it was his sheep. Defendant then asked the witness how he knew, and witness replied that he knew by the brand; that the defendant had no business to touch the animal. Defendant replied: "I don't know whether I had or not," and witness responded: "I will show you." Witness then caught the sheep, looked at it, and came to town and made complaint.

The defendant did not tell the witness to take the sheep if it was his property, nor did he try in any way to conceal the sheep. It was marked with a swallow-fork in both ears. After his arrest the defendant refused to surrender the sheep unless the witness would swear to it. Witness sent word to the defendant by his herder, Rufus Clay, that the sheep was his; that Barnett & McKeen left the animal in the "post" for him. Witness did not know whether or not the defendant ever received the message. When defendant hailed the witness the two were about seventy-five yards apart. The defendant came towards the fence in the direction of the witness, and the witness rode towards him. Defendant then told the witness to go and look at the animal in his yard. Witness replied to him that he, witness, had sent him word that it was his sheep, and the defendant denied that witness had ever sent him any such word. When said sheep was taken by the defendant it had a lamb, which was also taken. The two were worth about five or six dollars.

Rufus Clay testified, for the State, that he had lived with the defendant for about seven months. Hughes did not, in front of Eustin's or elsewhere, tell the witness that he had a sheep in the "post." Witness and Hughes had a talk at that place, but the subject of discussion was a sum of money Hughes owed the witness. Witness did not tell the defendant that Andy Hughes had a sheep in the post. Hughes did not tell witness to tell defendant that he had a sheep in the "post."

Doctor Thurman testified, for the State, that he told the defendant that he, witness, was informed by the herder of a sheep man living southwest of Ben Ficklin that the sheep in question belonged to another sheep man living south of said town, and did not belong to the defendant.

Cross-examined, the witness said that he did not recollect

when he told this to the defendant, but it was some time before the sheep was taken. Witness told the defendant that he, witness, expected one of his, defendant's, sheep was in the "post," that there had been several sheep in there, and that one was still there. He asked the defendant if his sheep were branded, and he said that they had no wool-brand. Witness then told the defendant that this sheep was not his, as it had a red paint brand. Something, the witness did not remember what, was said about the ear marks. This was before the taking.

J. N. Garrison testified that Hughes told him that he had a sheep in the post, and would give the witness a dollar in the spring to take care of it for him. The sheep was taken four or five days after this.

B. F. Akers testified, for the State, that before the sheep was taken he told the defendant that Hughes claimed the sheep.

Mack Vandevere testified that he and Hughes owned the sheep in question. It was branded with red paint and lamp-black, and was the same sheep which defendant's herder drove from the "post." Witness knew of several of the defendant's marks, but none resembling that in which this sheep was marked.

T. F. Horton testified, for the State, that he and the defendant talked about defendant's herd of sheep several times. Defendant never said anything to witness about branding such of his sheep as had screw worms. Witness and defendant had one talk at the store about this sheep. He asked witness what talk there was about it, and witness replied that it gave rise to a great deal of talk. Defendant then told witness how the sheep got into the post—that, when he was killing hogs, his sheep and goats got in, and that he branded this sheep because it had screw-worms. He further told witness that he sent his herder to get the sheep if it was his, and that when the herder returned with the sheep he told him that he did not think it was his. He said that he told his herder to leave the sheep in the post if it was not his. The herder told the witness that he, the herder, put the black mark on the sheep. Defendant said that the scar made by the screw worms was still on the sheep, and that he was going to show it to Hughes. Defendant further said that he did not know whether or not the sheep was his.

McKeen testified, for the State, that he herded sheep in the "post" in the winter of 1882, and left one in there which was claimed by Hughes. It was a white sheep with a black

mark on the side of the back, and a red mark on the hip. When the witness drove his sheep from the "post" he put the sheep in question in a pen at the "post" to keep it from following, turning it out after he got his own sheep away. Witness did not know who got the sheep, nor did he know that the defendant had any sheep in the "post" that winter.

Wm. King testified, for the State, that on the day of this trial, after the defendant had given bond, the defendant stated that he knew the witness would appear on the stand for the State, and asked him what the State expected to prove by him. Witness replied that he supposed it was the State's purpose to prove what he, defendant, said about the matter when he, witness, arrested him. Defendant then asked what he did say, and the witness replied that he expressed some doubt as to whether he owned the sheep. Defendant told the witness at this time that he put black marks on all his sheep that were infested with worms, in order to distinguish them. This statement defendant made to witness when first arrested, and again after being released on bond.

A. J. Hughes, recalled for the State, testified that his sheep in the "post" was branded with a black mark on the back, and red mark on the hip, and marked with a swallow-fork in each ear. He owned two hundred sheep in that mark. If the defendant had any sheep in similar mark and brands the witness did not know it, and would not assert that he did not. At shearing time witness asked the defendant if he was going to brand his sheep, and he said that he was not. Witness replied that he would like for him to do so, in order that their sheep might be readily distinguished.

B. F. Ackers was the first witness for the defense. He testified that just before the defendant drove the sheep to his house, which was very early in the morning, he, witness, saw sheep being driven out of the "post" by two parties whom he took to be Rufus Clay and the defendant's little son. Witness went to the defendant's house after breakfast, when the defendant told the witness that he had sent into the "post" and got the sheep. In the afternoon of the same day, the witness was planting in the defendant's field, and heard the defendant call to Hughes, who was riding along the prairie. Hughes and the defendant met at the fence and had a conversation. Hughes was not passing, but was riding along down the fence. Rufus Clay and one

or two of the defendant's little boys were present at that conversation.

Rufus Clay testified, for the defense, that he was engaged in herding sheep for the defendant, and was so engaged in the fall of 1882. He left one of defendant's sheep in the "post." That sheep was marked with a swallow-fork in each ear, and was branded with a black stripe on the side. Witness put the sheep in the "post" after shearing, because it was infested with worms. Defendant afterwards sent witness for the sheep, and witness got it and turned it into the defendant's yard. Defendant called Hughes after that and told him that he, defendant, had a sheep in his yard, which he thought belonged to him, Hughes, and told Hughes to go and look at it. Defendant branded about twenty sheep in the presence of witness, three or four of which are still branded. Witness doctored this sheep for screw worms, and left it in the "post." That sheep had a red mark on it, which witness did not notice when he first drove it out of the "post." The defendant did have sheep marked with a swallow-fork in each ear, but witness did not know whether he owned any now in that mark. Several of the defendant's branded sheep died during the winter.

Richardson testified, for the defense, that he lived in the "post." He did not know that defendant's herder left sheep in there. There were sheep and goats in the "post." Witness showed the defendant the carcass of a sheep. Some two hundred sheep died there during the winter. Other parties had sheep in the "post." Witness did not know that defendant ever had a sheep to die in the "post;" nor did he remember that he told the defendant that the carcass was that of one of his sheep. He did not tell defendant that his sheep had a lamb. He knew that this sheep belonged to Hughes before the lamb was dropped.

J. A. Hicks testified, for the defense, that he knew that defendant owned a herd of sheep in which were some marked with a swallow-fork in both ears. The witness had seen the defendant brand sheep with a stripe, sometimes on the back, and sometimes on the side. He did not know that any of defendant's sheep in this brand were now living. The witness remembered particularly one of defendant's sheep in the swallow-fork mark described. The animal was an old ewe which his, witness's, boys called "Old Sharp," because of the remarkable resources she displayed in her efforts to escape capture by herders. Wit-

---

---

ness had the defendant's sheep for a time. He did not know that defendant branded any of his sheep after the fall shearing.

The motion for new trial, which was overruled, set up the grounds discussed in the opinion, and in addition averred that the verdict was against the law and the evidence.

No brief for the appellant has reached the Reporters.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE. A bill of exceptions recites as follows: "Whereupon the jury in said cause were sworn as to their qualifications, and upon the examination of said jurors five of said jurors disqualified themselves, and the court ordered the panel filled with other jurors, and the officer proceeded to and did summon said five jurors in the court room; to which the defendant excepted, as they did not belong to the regular panel, and hence could not be summoned in the court room."

This action of the court in impaneling jurors summoned in in the court room is assigned as error. No doubt this exception was based upon section 22 of the Jury Act of 1876 (Laws 15 Leg., p. 82), which provided that, "in summoning jurors to supply deficiencies in the panel, it shall not be lawful for the sheriff or any officer to summon as a juror any person found in the court house, or court yard, if they can be had elsewhere." But this provision of law is no longer in force. It was omitted from the Revised Statutes, and was thereby repealed. But even were it still in force, under the decisions of this court rendered while it was in force, the action of the court here excepted to would not be error which would reverse the judgment. (*Mathews* v. *The State,* 6 Texas Ct. App., 23; *Frye* v. *The State,* 7 Texas Ct. App., 94.)

Another bill of exceptions states that defendant placed upon the witness stand Rufus Clay, his sheep herder, and asked him the following question: "Did the defendant state to you, and in your presence, on the morning and just before he sent you for said sheep, that if it was not his, not to bring it over?" to which the State objected, which objection was by the court sustained. It is not shown by the bill of exceptions what the State's objections to this question were. Nor is it stated in the bill of exceptions what answer the defendant expected the witness to make to the question. As the matter is presented to us we cannot say that

the court erred in refusing to permit the witness to answer the question.    In the shape in which the question appears in the bill of exceptions, it is clearly leading, and for this reason alone the court would have been warranted in refusing to allow the witness to answer it.    (*McCarty* v. *The State,* 4 Texas Ct. App., 461; 1 Greenl. Ev., 434.)

And furthermore, as it is not stated in the bill of exceptions what answer the defendant expected the witness to make to the question, we cannot presume that the answer would have been an affirmative one, and that the defendant had been prejudiced by its rejection.    If this proposed evidence had been offered in a proper manner, that is, if the defendant by proper questions could have elicited from this witness the affirmative facts which the leading question propounded to him indicates he expected to prove by him, we think, as part of the *res gestœ,* and bearing upon the issue of the *intent* with which the sheep was taken, such evidence would have been admissible.    But the question of its admissibility is not before us in a shape that we can pass upon it, and we must hold that, as presented in the record, there was no error in the ruling of the court excluding it.    (*Powell* v. *The State,* 5 Texas Ct. App., 234.)

There is another bill of exceptions in the record, excepting to the action of the court in not permitting a certain question propounded by defendant to a witness to be answered; but we can not, for the same reasons which we have stated with reference to the last noted exceptions, say that the action of the court was error, because the question as set forth in the bill of exceptions was a leading one, and it is not shown what the evidence was that was expected to be elicited by the question.

We have found no error for which the judgment should be reversed, and it is therefore affirmed.

*Affirmed.*

Opinion delivered May 5, 1883.